[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] (Court's findings and orders)
Hilary B. Miller, Esq., for the plaintiff.
Dianne M. Andersen, Esq., for the defendant.
Sharon Wicks Dornfeld, Esg., for the children.
Diana Genovesio, Court Recording Monitor.
THE COURT: Counsel, would you state your names for the record, please, and who you represent.
ATTORNEY MILLER: Hilary B. Miller for the plaintiff.
ATTORNEY ANDERSEN: Dianne Andersen, representing the defendant.
ATTORNEY DORNFELD: Sharon Dornfeld for the minor children.
THE COURT: All right. Thank you.
This matter comes before the Court by a returnable on May 20, 1997 in which the plaintiff, who is Corey Lakin, seeks, among other orders, a dissolution of the marriage to David Lakin. There were pendente lite orders entered at the local court in Danbury and the matter was referred to the Regional Family Trial Docket for counsel.
At trial the parties and the children were represented by counsel. The matter was heard for trial over approximately six trial days. Both of the parties testified; and there was also expert testimony presented to the Court from a Family Service's counselor; from a psychologist, who performed a Court ordered evaluation of both the parties and their children; and from individuals who were experts, two individuals who testified as to value of certain business interests owned by the defendant.
The Court also received testimony from two DCF, Department of Children and Family workers, and two other fact witnesses. Numerous exhibits were also entered into evidence. And, finally, there were also some testimony that was stipulated to in lieu of CT Page 16596 the witness's presence at trial, including Noah Lakin, one of the children of the family.
The Court has carefully considered the statutory criteria for a dissolution of marriage; custody; visitation orders; alimony; child support; a settlement of the marital estate, that is orders of property settlement of both asset and liability issues; counsel fees for the plaintiff, defendant and standards for counsel fees for the attorney for the minor children.
The Court finds it has jurisdiction over the marriage. One party has resided in the State of Connecticut for more than a year prior to the bringing of this action. There have been no minor children born to the wife since the date of the marriage. However, two minor children have been adopted by the parties and are children of the marriage. They are William Noah Lakin; born February 14, 1985, and Alexandra Shay Lakin; born. April 26, 1990. The Plaintiff is not currently pregnant. The parties have not been recipients of public assistance.
The Court finds for reasons stated hereinafter that the marriage between the parties has broken down irretrievably and there is no reasonable hope of its reconciliation.
These parties lived together for approximately two years prior to their marriage. In 1979 they commenced living together on or about July 23rd and continued until their date of marriage on August 29, 1981. During that time the defendant, Mr. Lakin, was the sole support of the two of them. They lived together in San Juan Capistrano, California. When the parties were contemplating marriage, Mr. Lakin informed Ms. Lakin that he wanted them to enter into ante-nuptial agreement prior to the marriage. They ultimately signed that agreement and were married.
The agreement was provided by the defendant and reviewed by the plaintiff with an attorney prior to signing it. The attorney was paid for by funds originating from the defendant. The attorney consulted by the plaintiff was a separate attorney from the defendant's. counsel. The plaintiff had lived with the defendant, as indicated, for approximately two years prior to this execution of the agreement. She knew Mr. Lakin worked at the family business, Lakin Tire of California. She knew that he wanted them to enter into an ante-nuptial agreement to protect the assets that he had inherited and was about to inherit from his family line. The plaintiff was not happy about the CT Page 16597 defendant's desire for an ante-nuptial agreement, but the Court finds she was not subjected to any coercion or stress from the defendant regarding the agreement. The parties entered into the agreement voluntarily.
In the defendant's claims for relief, fashioned as a request for a judgement that were filed with the Court at the commencement of this trial, the defendant did not seek enforcement of the ante-nuptial agreement. However, he did so in final, oral argument.
The Court makes the following additional findings regarding that ante-nuptial agreement. The parties were California residents at the time that it was entered into in 1981. And, at that time, they intended to remain California residents, and did so until on or about 1985. They briefly resided again in California, somewhere around the 1993, 1994 timetable, for a period of approximately six months. During all other times, the parties resided in the State of Connecticut until post separation. At one point, the defendant decided to move to New York and has lived there since then.
After the signing of the agreement, the defendant placed the San Juan Capistrano home in joint names. Every marital home that the parties have owned subsequent to that date have been held in joint names. Finally, as a result of these findings, the Court has been asked, by the defendant in his final argument, to enforce the ante-nuptial agreement entered into by the parties. And the Court must therefore rule on both its enforceability and which law controls; the law of California or the law of the State of Connecticut.
This is the plaintiff's first marriage. She was born on August 5, 1959. She's 40 years old. She has a high school education. Her employment history consists of sales work at a retail-clothing store. She ceased this work approximately three months after she and the defendant started seeing each other. It has been 20 years since the plaintiff has been employed outside of the home.
Ms. Lakin has both physical and emotional health difficulties. She suffers from endometriosis; it provides her with mild discomfort, which sometimes interrupts her sleep. She's been medicated in the past for the condition, but as of the time of the trial was not presently medicated for it. She may have to CT Page 16598 undergo surgery in the future for the endometriosis. She had a hysterectomy 10 years ago, in 1990. She continues to suffer with problems from ovarian cysts. She had nine surgeries from medical problems with her reproductive system.
She treats with a psychiatrist for depression, attention deficit disorder and anxiety. By prescription she was, as of the time of the trial, medicated with Effexor for the depression and Dexedrine for the attention deficit disorder. Occasionally as well, she is also medicated with Xanax for anxiety.
At the time of the parties' marriage, on August 26, 1981, which was 18 years ago, it was the defendant, Mr. Lakin's second marriage. He was born February 14, 1952 and is currently 47, almost 48 years old. He has completed three years of high school. His physical condition, health condition, is good; although he suffers from nasal polyps on a frequent basis and takes steroids for that and also, reportedly medicates for it with Vicadin. His emotional and mental health as presented is good.
In terms of his employment history, all relevant times that Mr. Lakin was employed during the time of the marriage, he was employed by Lakin Tire in one form or another. Prior to 1997, he worked, on average, of 15 to 20 hours per week. Thereafter his hourly rate of work fluctuated more completely as described here and after.
In March 1999, Mr. Lakin experienced a $175,000 per year pay cut, which is reflected in his current financial affidavit. His base salary in 1998 was $250,000 per year. The Court has fully examined Mr. Lakin's personal, financial information provided in tax returns, as to both his income and his receipt of benefits from Lakin Tire, both in the nature of benefits from profits as well as benefits from utilization of automobiles in the like. The Court has also examined the Lakin business, corporate and the like tax returns.
As of the time of trial, Mr. Lakin owned, among other things, the following assets, 50% shareholder interest in Lakin Tire West, which has variously been known as Lakin Tire of California; and a 50% real estate interest in 13250 Arctic Circle Associates. He had, as of the time of trial, sold his interest in Lakin Tire East and certain real estate in West Haven, which was owned by LTC Associates. CT Page 16599
The Court received expert testimony from two individuals' in regard to his business interest. For Ms. Lakin, a gentleman named J. L. Pearson testified. This was his first time testifying as a business appraiser. He's not a member of the American Society of Appraisers, and the bulk of his employment experiences disclose him as a credit analyst and a loan workout individual.
He sought to appraise the defendant's interest in Lakin Tire of California, the Arctic Circle Associates, and also Lakin Tire East and LTC Associates, which were not owned by the defendant at the time of the dissolution of the marriage. Mr. Pearson has absolutely no experience in real estate valuation. He found the collective values, or fair market values, of these four interests that he inferred and assigned to the defendant as of August 31, 1999 to be six million dollars.
The defendant, Mr. Lakin, had an expert named Mark Harrison testify. Mr. Harrison is an experienced business appraiser, who has testified before the Courts and is certified in the field of business appraisals. He valued the defendant's 50% interest in Lakin Tire of California as of December 31, 1993. He also found that there was no material change in that value to the date of trial based upon the information he testified he had. He also tested the sales price of Lakin Tire East, Inc. and LTC Associates, received by Mr. Lakin for reasonableness.
The methodology that Mr. Harrison used is recognized in the field, the valuations approaches are recognized, his assumptions were reasonable. He understood and highlight the importance of the risks of Lakin Tire having only five major clients. He discounted the interest of the defendant for the restrictions on market ability of his shares and he normalized the earnings of Lakin Tire in a straightforward and valid manner. The discount applied for from the minority interests of Mr. Lakin by way of being a 50% share holder rather than holding a majority interest and the discount applied for that, coupled with a restriction on marketability of share, was a 30% lack of marketability discount total.
The finding in conclusions of Mr. Harris were that Mr. Lakin's interest, 50% shareholder interest in Lakin Tire of California or Lakin Tire West, was $1,500,000. The Court finds the methodologies that he used were valid and the applications to earnings were valid. The Court finds the methodology used by Mr. Pearson and the failure to discount the values of Mr. Lakin was CT Page 16600 subject to criticism by this Court and therefore criticism of his entire approach. Further, his failure to understand or isolate out that real estate of LTC Associates, previously held by Mr. Lakin, rendered his opinion suspect and not credible. Aside from that, he failed to understand that Lakin Tire East and LTC Associates had been sold and test the marketability of that sales price, vis a vis his lump sum finding.
The Court finds the value of the defendant's interests in Lakin Tire of California, also known as Lakin Tire West, to be $1,500,000. The Court received, from the defendant's financial information, the following information about his interest in 13250 Arctic Circle, Santa Fe Springs, California. That his property interests were in a property that he declared to have a fair market value of $2,400,000, with a mortgage of $1,900,000; and, therefore, an equity position for the entire property of $500,000. As a one-half owner, he declared his equity interest to be $250,000.
The only other piece of information that the Court received upon evaluation of that property was in the Pearson evaluation. Mr. Pearson, the Court highlights, once again, has no credentials in, or experience in, the evaluation of real estate and therefore, his findings as to value are not credible before this Court. And, therefore, it shed no light on actual findings of the real estate values. The Court accepts the values declared by Mr. Lakin and finds his interest in the Arctic Circle property to be $250,000.
The property in Connecticut that was owned by LTC Associates, and the sale of Lakin East interest, by Mr. Lakin, netted to him $467,500, which includes, as a part of the payment of it, a note payable in the amount of $4,278.21 per month for 15 years at 7 1/2% interest. Mr. Harrison's analyses for the reasonableness of these sums, confirms to this Court that this would appear to be a fair sale of value and not a sale subject to any concerns about under valuation or fraud. Therefore, the Court accepts the sales and the values for purposes of valuation of the assets of the parties at the time of the dissolution of the marriage.
Now, the Court notes that all of these assets are aforementioned by the Court were inherited assets or assets which, while inherited, also were result from acquisition of interest of siblings who also inherited their interest. Mr. Lakin has worked in the business and has, in his own way, contributed, CT Page 16601 at least modestly, to the enhancement and preservation of those assets. The Lakin business is a fourth generation business, which commenced somewhere around 1914. Mr. Lakin commenced his work in the business somewhere around 1973, six years before he met Ms. Lakin.
His father died in 1979. He became more actively involved in the actual running of the West Coast part of the operation. From then on, as the Court indicated, it would appear that his work schedule was approximately 15 to 20 hours per week until the 1990's.
These parties, Mr. Lakin and Ms. Lakin, have lived during the entire period of time of their marriage, both separated and since separation, but particularly prior to separation, an extraordinarily excessive lifestyle. It is clear from the looking at the financials of the tax returns that Mr. Lakin was not overstating the excessiveness of the parties' lifestyles when he indicated that they spent about $50,000 per month; each and every month, year in and year out. It is now at the time of their dissolution of a marriage, after an 18 year marriage, absolutely irresponsible of both of these parties that they have, for instance, no funds accrued or saved for purposes of their retirement or for purposes of the subsequent college education of their children. These are two things that normal people concerned about their future and concerned about the well being of their children take care of before they start taking care of their own personal needs and need for entertainment and diversion.
The lifestyle described does not point to a desire to even spend this obscenely large amounts of money on the accretion of great worldly or cultural knowledge that they could pass on to their children. Instead, it was for things that were fleeting, consumable and ultimately not worthy in the end. If there's any tragedy of this marriage, it will be if these parties have learned the ability to gain insight from the difficulties of the lifestyle they led and the emptiness that it produces.
The psychologically profile of both Mr. Lakin and Ms. Lakin do nothing to diminish these harsh criticisms. They would suggest that whatever problems underlie each party continue to exist and are entrenched in their personalities: in each of you. The Lakins will need to come to terms with that if they seek to try to act responsibly in a variety of areas, including finances. During the period of the parties' separation, while speaking about finances CT Page 16602 prior to a Court order, Mr. Lakin was providing approximately $10,000 per month as support to Ms. Lakin. He was occasionally late in the payments, occasionally missed payments; not always consistent, but, generally, provided those sums. Somehow the utilities at the marital home managed to get shut off or not provided for. Each party points fingers at the other for this absurd situation. A glance at the financial affidavits of both parties discloses that this was clearly an avoidable result. The "War of the Roses", is it, might be, had that occurred between these parties meant that the children suffered to the advantage of no one.
The Court does not think that it is reasonable for Ms. Lakin to receive sums of those kind, even when missed, and not keep her basic utilities on. On the other hand, if Mr. Lakin found it inappropriate that the bills weren't getting paid to the utilities while he was providing that level of support, he too could have made sure the utilities stayed on and sought relief in another form so that he made sure all was well and stable for the children. Neither party acted responsibly in this particular light.
The Court does not, however, believe that $10,000, without a Court order, is such an inappropriate level of support for Mr. Lakin to have provided voluntarily that he should be — held to blame for the fact the utilities did not get paid.
The parties own a variety of other assets, and they are as follows. The marital home at 110 Salem Road, Ridgefield, which has a fair market value of $1,550,000 with debts thereon that the Court will describe in a moment. Mr. Lakin owns an option on the Staffordville home that he lives in. It has an option price of $1,200,000, established in August of 1999. He apparently has a security interest in that property of approximately $20,000. Based on the parties' financial affidavits he also owns a 1987 Porsche. The Court received no evidence, other than the financial affidavits, of the value of that Porsche, the condition of the Porsche, or the like. Therefore the Court, based upon the financial affidavits, finds the value to be $11,800.
The defendant has some watches which apparently are worth about $29,000. The Court finds that the value of the horse known as Flashdance is $30,000. The defendant has a gun collection which the Court finds, based on the financial affidavits, has a value of $20,000. His two 401K's; a California one, which as of CT Page 16603 June 30, 1999 has a value of $18,230 and whatever has accrued or lost since that date, and a Connecticut 401K; which as of the same date had a value of $8,552 and therefore, has accruals and losses from that date.
The Court received absolutely no evidence as to the cash value of any life insurances on Mr. Lakin's life. The only inference to the life insurance is, at one point, was in the testimony disclosing that the cash value was being used to pay the premiums. It's not clear whether it's the cash value at loan, or dividends, or the like. But based upon inadequate information before the Court, the Court makes no finding as to an asset of cash value on life insurance policies. Mr. Lakin has a State of Connecticut refund of $6,775. There are various contents of the home that the plaintiff resides in and contents of the home the defendant resides in; and the Court specifically declines to assign values to those
The parties also have a variety of debts not withstanding the income over all these years. The defendant has a debt to Bright Harbor, LLC; which is liened on the Ridgefield home and also has a charging lien on the West Haven sale and has a value of $74,000, the debt. There was some testimony that it is being paid down on an interim bases through the West Haven sale while a negotiation is being made for an ultimate payment schedule for it. But in the absence of the specific amounts that have been paid down to credit against that debt, the Court makes no findings of actual payments.
The defendant has an American Express card with a balance of $68,000. The parties have a Sears credit card indebtedness, or business indebtedness, of $42,702. The defendant has a Chase Visa of $26,669. The parties owe the Federal Government on their 1996 tax return; $78,073 in taxes plus accrued penalty and interest, for a total of $124,000 as presented to the Court. The defendant also owes, on his 1998 tax return, $58,664.
The parties' mortgage on the marital home has been in arrears since November 1997; the monthly payment is $10,514. As of November 1999, which is after the date of the time of trial, but there is no evidence before the Court to suggest that somehow after October 1999 payments were going to miraculously be made, so the Court is including November for purposes of valuation. There's 24 months unpaid, which would suggest an accrued arrearage of interest of somewhere around $252,336 plus the cost CT Page 16604 of foreclosure on the mortgage. The original principle amount on the mortgage was approximately $1,050,000.
The plaintiff has two liens on the property. One from Rosenbaum and Filan, for attorney's fees arising out of this action and the PJR — attached amount of $29,500. And a second to Nusbaum's Law Firm in the attached amount of $30,000. The plaintiff has a laundry list of debts, which are disclosed on her financial affidavit which the Court need not repeat. And there's no evidence to suggest that the amounts of the debt are different than those shown on the financial affidavit. So, the Court accepts those amounts for purpose of valuation.
The Court is often asked by the parties to find a reason for the breakdown of the marriage. And the Court must, in fact, under statutory criteria consider what the cause of the breakdown on the marriage is. This Court can not point to any one singular factor for the cause of the breakdown of this marriage. By all accounts, this marriage was proceeding fine with no perceptible problems, at least until 1990.
In 1990, Ms. Lakin faced a hysterectomy. The parties had Mr. Lakin's teenage daughter from his first marriage come live with them. The parties had just adopted the newborn, Lexy, and this was a lot on the plate for anyone. It certainly was quite a bit for Ms. Lakin, who was functioning, at that period in the family's life as the primary caretaker for the children; and that included Mr. Lakin's daughter, Jennifer, as well.
The Court is aware that she had full time household help. However, the pressures of caring for these children and dealing with the aftermath of a significant operation such as a hysterectomy, which is significant not only because it's a major physical operation, but it's also significant because it meant the end of any opportunity to bear children, was a challenge for Ms. Lakin. The parties had been living in Connecticut for about five years at this point.
It is not clear to the Court how it occurred from 1990 to about 1993, 1994, but the pressures of life and the difficulty she was facing caused Ms. Lakin to start to suffer from depression. Mr. Lakin referred to it as her having the blues; the medical term for it is dysphoria.
During the period of time before this became full blown and CT Page 16605 overwhelming for Ms. Lakin, and prior to 1990, by every account Ms. Lakin was an able and nurturing parent. Certainly, in the earlier years of Noah's life, she was very much a full time parent. After the pressures of these particular things that the Court described, depression became increasingly worse.
In 1994, or there abouts, some parties have differed that it may have been 1993, but it appears it was 1994; the parties decided to try a return to California hoping that the support of her, Ms. Lakin's family and the like, would be helpful to her and to improve her situation. Furthermore, Mr. Lakin was looking to see if he could be working successfully back in the California end of the family business. It was an unsuccessful move for Ms. Lakin, personally, for Mr. Lakin, in terms of the business and for this family, generally. After approximately six months the parties returned to the State of Connecticut. This was an increasingly pressurized situation for Mr. Lakin, who was therefore then carrying two homes on the same financial circumstances that they had carried one. Ultimately, he was able to unload the second home.
From 1995 to 1997, and to the present time, Ms. Lakin has been treated by a psychiatrist for her depression and anxiety and attention deficit disorder. The Court notes that, while Mr. Lakin was facing increasing difficulties financially, he was attempting to help out by all accounts, including Dr. Reitano, in the home on a more frequent basis. However, his ability to be perceptive as to what the needs of both his wife were and his children were were minimal. He continued to engage in other interests and pursuits, including sailing to satisfy his own particular needs.
The parties had full time help in their home throughout this period of time to assist Ms. Lakin, both with her household responsibilities as well as with the children. The parties were also dealing with increasing difficulties and problems for the minor child, Noah. Noah had been attending private schools in Connecticut and California and on return to Connecticut, a reevaluation of that situation occurred. He had an evaluation conducted for him at Eagle Hill, which is disclosed in the most general terms: a child who is very able, but had certain learning disabilities which prevented him from maximizing the use of his potential that were disclosed. He also was showing an increasing and alarming hostility to his sister, Lexy.
The parties decided to minimize the pressures on him by CT Page 16606 putting him in public school and hoping that the services provided there would be of assistance to him. Briefly, he was considered to be a candidate for medication, but the medication did not continue.
Throughout this period and time, and prior to the parties' separation, Ms. Lakin continued to suffer from her depression, which, at times, became overwhelming. In 1995, on the return to Connecticut, Ms. Lakin was often unable to get out of bed to meet her daily responsibilities around the house and to her children. This situation has continued on a periodic basis to today. This description would seem intentional, but it is not meant to be so. This is a result of her conditions which have debilitated her ability to function in ways that are necessary for the day to day running of the household.
Mr. Lakin, while aware of his wife's depression and debilitation to some extent, did not pick up the ball and run with it completely from there. He met some of the additional responsibilities but did not, during the period of time that the parties living together, attempt to completely replace her responsibilities with his own in the care taking of the children. As a result, the children suffered from the inattention of both of their parents.
The marriage also suffered. Each party felt abandoned by the other and felt that neither party was paying attention to their needs and nurturing them. For her part, Ms. Lakin was clearly unable to do so. And Mr. Lakin may well have been responding to that in his inability to nurture her. It has not been lost on the Court that Mr. Lakin grew up in a home where his mother was ill much of the time. And that this sort of deja vu all over again had to have been troubling for him and difficult in terms of maintaining the necessary intimacy for a marriage to survive. The parties grew apart.
The difficulties of that meant they sought attentions elsewhere. The parties sought a family vacation in March of 1997, they did not come back together. Ms. Lakin had some ear problems, whether they were real or perceived, is not clear to the Court, but it was not a good situation. Then the family was suppose to go on a vacation to the Caribbean and Ms. Lakin, by inadvertence or otherwise, failed to return from California in time to take the family vacation. This is a situation in which both parties were not listening to each other; or attentive to the scheduling CT Page 16607 needs of each other, because they were starting to go about life in different circumstances and on different schedules. Neither party is to blame for it. It's literally when something starts to fall apart it just starts falling apart completely.
The Court is aware that Mr. Lakin had at least one, perhaps three, instances which during that period of time of that year was involved in brief liaisons with other women. They were not the cause of the breakdown of the marriage. They were ill thought out, they were gratuitous, they were an inappropriate seeking of attention, but this marriage had already had the seams falling apart from it.
Similarly, Ms. Lakin's coincidental running into Mr. Logan and dealing with him from 1997, about this time forward, was simply as a result of, he caught her attentions because her attentions were not being captivated by Mr. Lakin. The parties simply were not paying attention to each other anymore; they were not functioning as a marital unit.
The separation is not the fault of one or the other. Had the parties spent a little bit of the time that they spent on extravagances and a high lifestyle, simply sitting at home listening to each other and paying attention to each other, perhaps this rather tragic circumstance might never have come about, but it did. The parties' separation occurred, they tried a brief bird nesting arrangement in May of 1997; those are destined to fail and this one did too. The parties fully separated. Therefore, and thereafter, they lived in separate homes.
The parties briefly worked out a visitation schedule of Mr. Lakin with the children. However, it was not significant and was a schedule that — Strike that, non-significant is not the right word. It was not meant to be a stable situation and, ultimately, Court orders were going to be required to have a reliable schedule for both parties to operate on, in terms of his access to the children.
Now, how were the children doing through all of this? While the parties were living together in 1995 to 1996, Noah was, in grade five, absent 22 days and tardy 22 days. In 1996 to 1997, he was absent 29 days. 1997 to 1998, which is all post separation, he was absent 22 days. And in 1998 to 1999 he was absent 7 days and tardy 3 days. Lexy, in the 1995 to 1996 school year, when she was in Kindergarten, was absent 34 days and tardy 12 days. 1996 CT Page 16608 to 1997, she was absent 30 days and tardy 30 days, these are all pre-separation. Clearly, no one was paying attention to these children in the last couple of years. Post separation in 1997 to 1998, she was absent 13 days and tardy one. In 1998 to 1999, when she was in third grade, she was absent 18 days and tardy 43 days.
While Noah's absent and tardy ratio has gone down, in the present school year, his performance has been abysmal. While this school year is not well underway, at least one quarter of it is gone; he has been, by the reports presented to the Court, in danger of failing three significant subjects; Science, Math, and English. Of the subjects that he was okay in; Ceramics, Gym, Health and Social Studies, only one can be really construed as a significant academic subject. He has, for the first time, become a behavior problem in school and showing signs of not being attentive to or responsible and respectful to his teachers.
When these parties engaged in this custody dispute, two evaluators were appointed to perform an evaluation of the parties. They had available to them a variety of resources. Significantly, they had available to them the therapists for the two children, Dr. Sandler and Ms. Olifson, and other information was integrated in the reports provided, particularly Ms. Clinton's report. But they did not testify before this Court. Heather Clinton, the Family Service's counselor, provided a comprehensive report, which made significant efforts to cover the social history of these parties.
The Court will not go over the entire report, but notes the following things as a result of the testimony, Ms. Clinton's testimony, in that report. Neither party exercised good judgement in the exposure of these children to significant others, post separation. The presence of Claudia Hateman, a 25-year-old woman, in the lives of these children was troubling and threatening to them. The presence of Greg Logan in the marital home with Ms. Lakin so soon after the separation did not provide, similarly, the children an opportunity to re-adjust to their new family unit of living with their mother without the interference of a third party, who must, at least, represent a replacement of the father as another man in the home. Both parties prevented the children from an opportunity to just adjust to their parents in two individual and separate homes by the immediate introduction of their significant others.
The other facts that become apparent after reading these CT Page 16609 reports, Ms. Clinton's report and the evaluation testimony that she gave, is that post separation — the issues that arisen in regard to casting bad words, one upon the other of the parents to each other, have caused these children to suffer. The following is noted, for instance. As a result of these instances, Noah is far too educated as to Ms. Lakin's specific complaints about Mr. Lakin's parenting of Lexy. It is inappropriate that Noah know that Ms. Lakin questions his boundaries and limit setting for Lexy vis a vis whether or not he should be cleaning her bottom after going to the bathroom and alike. These are issues that are inappropriate for children to be involved with.
Similarly, that Mr. Lakin has felt that Ms. Lakin lacks capacity to parent on a day to day basis because of some of her issues, particularly depression. He has some way similarly come across to the children and particularly to Noah. And that, as well as the instance of his care taking of Lexy, could not be issues before the children unless they have been exposed to by both parents to inappropriate conversation about the other parent, which is not good for them.
Now, there are certain Court orders that the Court must reflect that occurred pendente lite before the following additional findings. The Court notes that December 9, 1998, after a hearing, Judge Owens wrote a memorandum of decision requiring, quote, unquote — it made the following orders, "72% of the 1998 bonus the defendant represents he will receive, in an amount no less than $325,000 shall be used toward payment of any outstanding arrearage that the parties are obligated to pay for Federal and State income tax obligations. Twenty-eight percent of said bonus shall be used to pay the mortgage arrearage on the family home at 110 S. Salem Road, Ridgefield, Connecticut. Both parties shall continue to be responsible for the mortgage payments on the family home at 110 South Salem Road, Ridgefield, Connecticut. The defendant shall immediately pursue the renegotiations of the existing mortgage and plaintiff is ordered to cooperate fully in obtaining the same."
In regard to that, the Court has already noted that the mortgage was not paid. The Court notes the following additional fact, and that is, one, pendente lite orders were entered in this matter. The defendant was ordered to pay the plaintiff $13,650 per month; he has done so. The Court finds that Mr. Lakin did attempt to renegotiate the mortgage without success, however he did not strictly comply with the terms of Judge Owen's order in CT Page 16610 regard to the 28% of the bonus. In that that sum, the $37,500 that he's currently holding, it indicates shall be used to pay the mortgage arrearage. The Court finds that Mr. Lakin should have made greater efforts to make an actual application of both sums to the actual mortgage arrearage, rather than tying them to an attempt to renegotiations. The language of Judge Owens was clear and one item was not made contingent upon the other. The Court does note that he continues, in one form or another, to hold those sums.
The Court also ordered on February 1, 1999 that — and it was done by agreement, "the parties hereby stipulate and agree that there shall be an immediate evaluation of the allegations of sexual abuse concerning Alexandra by an agency selected by DCF." More about that in a moment. And then it goes on to say that "the parties shall fully cooperate with the DCF investigation and evaluation."
In January 1999, Ms. Clinton's report was due. Shortly prior to the report being late, which it appears it would have been, the plaintiff reported that the minor child, Lexy, had certain inappropriate drawings, which the Court never saw, so the Court can't draw any conclusions about them. But, apparently, they at least inferred advanced and inappropriate sexual knowledge by her at her age. Mental health professionals are mandatory reporters and this information all found its way to the Department of Children and Families.
Ms. Lakin and Mr. Lakin were ordered to cooperate in that DCF investigation. The Court finds that Mr. Lakin cooperated fully in that DCF investigation. The Court finds that Ms. Lakin did not cooperate in that DCF investigation fully. That she failed to produce the minor child for certain visits with Dr. Sink, and to cooperate in other ways as required by DCF for the investigation.
The Court ultimately puts no weight on DCF's, quote, unquote, substantiation of neglect, because that's a subjective finding by a DCF worker. However, the underlying events that require — Strike that. The underlying events that put them in a position of choosing to make that finding were events in which Ms. Lakin did not cooperate with the DCF investigation. This was particularly troubling. In light of the fact that Mr. Lakin's visitation with the minor child, Lexy, was suspended during the period of time of the investigation. This was ultimately not good for the minor child. A prolonged period of time for a child not to have access CT Page 16611 to and the nurturance and support of another parent without due cause is harmful to the child. This was the second time that Mr. Lakin was deprived contact with his children by an action, direct or indirect, of Ms. Lakin. In the summer previous he had no contact to speak of with Lexy at all, and had only the briefest contact with Noah.
The Court notes the following from Ms. Clinton's report. First of all, she recommends joint legal custody and recommends that the children stay in the primary care of Ms. Lakin, and wants services put in place, that those of us who have been familiar with Juvenile Court would best describe this, as Attorney Dornfeld did, as Intensive Family Preservation Services. It's a nomenclature that we live with in Juvenile. What it does mean is it's a comprehensive umbrella of services placed in the home to assist Ms. Lakin with the actual tasks and chores of parenting and household chores during the week. And, also, provides her with educational services as to how to better manage or control certain situations. It also provides her with assistance in receiving the support of outside third parties in the caring of the children as it would be deemed necessary based upon the observations. A variety of other recommendations are made by Ms. Clinton which include a review by the Court in six months.
This Court is troubled by these recommendations for a variety of reasons. The first is in regard to the joint legal custody recommendation. The evidence discloses that Mr. Lakin and Ms. Lakin do not communicate well at all. Theirs is a poisonous relationship. The best communications between them occur by fax, or the like, and not in person. Mr. Lakin, does not trust Ms. Lakin as a result of some of the instances that have occurred post separation, most notably including the DCF referral for which Ms. Lakin has not, in his mind, ever apologized to him for.
Ms. Lakin is full of enmity, bitterness and mistrust of Mr. Lakin. It was notable to the Court in her testimony before the Court that many questions posed a challenge for her to answer directly and specifically, unless the question invited her negative response about Mr. Lakin; and then Ms. Lakin was able to testify with clarity, with specificity, and with unusual energy. This is not a good relationship between these two parents. And joint legal custody presumes that the parents can operate together and function together in a collaborative way for the decision making for the better of the children. Where that can CT Page 16612 not occur, the Court specifically finds it is not in the best interest of the minor children for the parties to have joint legal custody; and this Court so finds here.
For Ms. Clinton, joint legal custody was only going to be able to work if the parents had co-parenting counseling. This case has been in the Court system for almost two years; it is too late for that at this point. These children have very little left of their childhoods, respective childhoods. They deserve a situation in which their parents are not required to bring their bitterness and mistrust of each other to the table, to every time an important decision needs to be made for the children.
This six-month review is similarly not good for these children. They need this continuing conflict between their parents to end; without them having to have another lawyer represent them or the same lawyer revisit them, again with further Court proceedings injecting them in the middle. These children are very cognizant of these Court proceedings. They are aware of them and they need them to end so they can go about the very difficult and full time consuming job of just being children. Therefore, the Court is not going to order a six month review and there is nothing, frankly, in the facts of this case that suggest such a six month review is necessary.
Somewhere in Ms. Clinton's testimony the Court remembers and recalls her referring to the literature of a psychologist named Maslow; in which she was trying to explain that making custodial decisions, the first thing she looks at is who can meet the basic needs of children. And the basic needs, at that point, she was describing are things such as shelter. This Court doesn't dispute that both parties can meet that basic of a need of shelter and food. However, the quality of that presentation of those basic needs and those needs almost as basic, and that is, the ability to function and have a parent deliver themselves where they need to be, when they need to be for purposes of functioning on a day to day basis is equally important to children.
In our law, in the State of Connecticut, the failure to present children to school is an offense for which a parent can lose their children. While the situation has been allowed to linger here for several years that these children have missed significant amounts of schooling, it is not something that they can risk a continuance of.
CT Page 16613 The very comprehensive and thorough report by Ms. Clinton also investigated allegations in regard to drug use and inappropriate boundary issues for Mr. Lakin. The Court is in no way condoning the historical use of drugs in this family, particularly of marijuana and some sporadic use of cocaine by Mr. Lakin; and the use of painkillers by the parties, each of them, during the time of the marriage. However, the Court also received drug tests that showed negatives for the parties — negative results. While there is an inappropriate desire, apparently, by each of the parties from time to time, but particularly in this instance by Mr. Lakin, to satisfy his individual needs or cravings by utilization of drugs, it has not occurred in recent time and is not a basis for the Court's decision.
Dr. Reitano, if I'm spelling it correctly, and Jodi — I'm recalling her last name incorrectly, Rosner, I believe it was, were the two lay persons who testified before this Court — Jody Rosnick, excuse me. Jody Rosnick was 24 years old when she testified before the Court. She'd been the parties' babysitter and a close friend of the family when she was growing up as a youngster, a teenager in their neighborhood. She was a very credible witness. This Court accepts her testimony of the fine qualities that Ms. Lakin exhibited as a parent and homemaker, prior to being consumed by her mental health difficulties. The Court also accepts Ms. Rosnick's testimony as to the inappropriate behavior of Mr. Lakin with her, on one instance, and the Court is convinced that it was a troubling and scary occasion for Ms. Rosnick, who has, by appearances, survived it well as a young lady. This instance, together with the testimony in regard to the utilization of a prostitute, and the present 25 year old girlfriend, suggests to this Court that Mr. Lakin has certain issues, which were inferred by Dr. Adamokis but not pursued completely on what was described by Dr. Adamokis as objectifying females, which can be troubling. This was, specifically, that he did not know appropriate boundaries for contact at all times with females and can put himself in occasionally dangerous situations, which can also be dangerous for others.
The problem with Ms. Hapeman is not that she's 25 for Mr. Lakin, it's that she's 25 for the two minor children. They have a sibling close, if not exactly, at that age, who is Mr. Lakin's daughter. While he may be able to separate out the age, issue, it's much more difficult for children to be able to do that. And so his relationship with Ms. Hapeman can be very challenging to CT Page 16614 them when they see him having a romantic relationship with someone the age of their sibling. This is the inappropriate boundary that the Court is concerned about in that instance; not the fact that there is merely an age difference between Mr. Lakin and Ms. Hapeman.
The other lay witness that testified is Dr. Michael Reitano, who was 45 years old at the time that he was testifying, and rehabilitating from some fairly tragic incidents that he himself suffered. He was, however, not withstanding his traumatic injuries; cogent, intelligent and understandable, and understanding on the witness stand. The Court finds that he understood the questions he was asked and he gave intelligible, rational answers, and, therefore, that his disabilities did not interfere with the information and evidence that he provided. The Court similarly found him to be an extraordinarily credible witness, just as Ms. Rosnick was, before the Court.
It is to be highlighted and noted that he was called as a witness by Ms. Lakin. He recalls Ms. Lakin's stellar qualities as a mother and homemaker prior to her illnesses. And he recalls that after her illness, which he describes as happening in a severe way just prior to the move to California, she became overwhelmed. She had difficulty in the children's scheduling, attention to cooking, helping the children with their homework or projects. She was less attentive to grooming issues and she was simply not the same with the children as she had been prior to that.
He testified that Mr. Lakin also picked up some of the slack in regard to the organization and detailing in the home. And that he observed Mr. Lakin to be a good parent, if he lacked anything, he lacked experience in parenting. This was very much a precursor to — or a foreshadowing to the testimony the Court heard later from Dr. Adamakos. Well, witnesses were taken out of order, I don't know if it was later or before, but separately from Dr. Adamakos.
The Court observed that Dr. Adamakos also provided expert testimony, which indicated the following. Prior to the — let me go back to Dr. Reitano, the last comment I want to make on Dr. Reitano is that Court found his testimony credible and accepts the facts in this case.
Dr. Adamakos was the individual evaluator who CT Page 16615 administered a battery of tests to the mother, father and children, here. The information gleamed from that indicated that Ms. Lakin was suffering in ways that were clear to the Court already; and had significant depression problems and occasional problems with histrionic behavior. Both of these conditions, to the extent that a lay person can witness them, were witnessed by this Court during the period of time that Ms. Lakin was a witness on the witness stand.
Ms. Lakin is a charming individual who presents herself well, but seems to suffer in a way that provides great empathy from the Court. Fluctuating from great depression one minute, unable to function and listen and respond to questions in a responsive manner, to another time being animated and almost unable to stay in her seat while she responds. These were things that were observed in her demeanor during the period of time of her testimony.
The high depressive condition and problems with perseverance and dependant needs that Dr. Adamakos noticed in the testing and evaluation of Ms. Lakin could not, he told the Court, be explained the way — merely by the situation and anxieties of foreclosure, divorce, and custody battle. While all of these are aggravating situations and difficult things for Ms. Lakin to have suffered with, her coping mechanisms were such that they all interfered with her ability to counteract her general anxiety and depression and, therefore, fed into it.
The underlying personality characteristics suggest that, therefore, even in the absence of these aggravating factors, those conditions would continue to exist. History being the best indicator of the future, it is noted that Ms. Lakin's unfortunate emotional difficulties with anxiety, her attention deficit disorder and her depression were in existence and in a full blown manner before the separation, before the foreclosure, before the custody battle and this divorce trial.
The evaluation of Mr. Lakin suggests that he is within normal limits, somewhat a perfectionist and somewhat compulsive. However, he presents as an individual who is sort of consumed with an optimism that if you work hard enough for something, things will work out; underlying the values of hard work and amiability.
The children's testing suggests that Lexy has CT Page 16616 significant problems which these parties both recognized. She was highly guarded, she was not terribly cooperative with the process, trying to protect herself and protect her emotions. She has had significant emotional difficulty over the last couple of years. She was not playing with anyone last year, she was not involved in any social activities and was having serious coping problems herself. The parties have agreed, and it will be part of the Court orders, that she engage in a separate psychological evaluation, if it has not already occurred in the interim since I last saw everyone, to help her therapist determine what some of her ongoing issues are and so that they can be more properly addressed both by her therapist and by her parents.
Noah presented as a articulate, eloquent child, which particularly struck the Court, in light of his poor performance in school these days. He presented as someone who could verbalize his position, who could interact with Dr. Adamakos at a very mature level, and exhibited a cockiness from it that is not reflective of someone who is in danger of failing most of his academic subjects. Perhaps most telling, however, is that when he wished he could be something someday, what he suggested he wanted to be was intelligent; and one wonders what emotional conflict there is for him over his academic capacities.
At the time that he was evaluated by Dr. Adamakos, he was disdainful and ridiculing of his mother. He found her unable to meet his needs, not awake when he needed her to be awake, not getting him to school when he need to get to school, not able to deal with his sister in an effective parenting way. He found her to be consumed by the divorce process and the like.
In the short time, from the evaluation by Dr. Adamakos, which was completed in early 1999, somewhere around February, to the time of this trial, it is reported to the Court that Noah has had a change of heart. And the stipulated evidence before this Court, in lieu of Noah's testimony is that he very much wants to continue to live with his mother in Ridgefield and attend Ridgefield High School. There is some context the Court needs to know. When he was doing poorly last year, his father told him, "If you don't want to go to private school, you'll have to bring your grades up and you'll have to perform better in school." Noah kept his end of the bargain up for a period of time, and now has apparently not done so. It would seem from the evidence, that a child such as this has tied custody to his father, to leaving the known surrounding of Ridgefield and the Ridgefield High School, CT Page 16617 even if he's not doing well there.
Mr. Lakin has presented a plan to the Court of attempting to enroll Noah at Trinity Pauling, a private school apparently 45 minutes from Ms. Lakin and 45 minutes from Mr. Lakin. And they, living about an hour and a half apart, it is a Sunday through Friday prep school, in which he's able to go home on the weekends. It's not clear to the Court whether he'll get into that school. But what it does evidence to the Court is a different philosophy between the parents in regard to the educational needs of this child. It is Ms. Lakin's desire to attempt to work within the school system of fostering and supporting Noah there. And Mr. Lakin's desire to provide him a more structured situation with the supplemental activities inherent in the boarding school he's describing.
This Court is not in the business of picking schools and does not micromanage custody orders by picking schools. The Court highlights the difference by indicating that this is another issue in which these parents don't agree in terms of what the needs are of this child. And the Court will comment on no further in regard to that, except for in regard to both he and Lexy to make the following additional finding. That Lexy's emotional difficulties and adjustment difficulties that she's having; and historical difficulties with regular and sustained attendance to school. And Noah's difficulties in school, academically and now socially, and his special educational needs, as identified for Eagle Hill, make both of these children appropriate candidates, if the custodial parent desires, for private school. And that they have needs, which while the public schools may attempt to meet our needs that are particularly able to be met by private schools.
The purpose of these findings, so the Court doesn't speak in gray areas for the parties, is at some point if the children do attend private school, however that may be, the Court has made a finding for economic purposes that a private school is appropriate for both of the children.
The Court had one other major issue — well, I don't know if it was major, but one other issue presented to it. And I don't want to forget to address it, I am going to take a moment to do that right now. Attorney for the minor children filed a motion for contempt in Court on October 28, 1999, which was heard as a part of these proceedings. On September 27, 1999, Judge Axelrod CT Page 16618 ordered each party to pay the attorney for the minor children's bill as follows. Each was ordered to pay the sum of $4,335.84 on or before October 25th of this year, and each was ordered to pay the same sum on or before November 30, 1999. The defendant has paid his share as it has come due on the evidence before the Court. Ms. Lakin has paid zero on or before October 25, 1999. And therefore, from that order, $4,335.84 remains outstanding.
The Court specifically finds that the plaintiff understood the Court order and that the plaintiff has paid nothing towards the Court order. The Court further finds, based upon the unallocated support order, that the plaintiff had the means to pay the order. Further, she received funds from her live in boyfriend at the time, Mr. Logan, vis a vis their antique business, which could have contributed towards the payment of the order. Nothing prevented the plaintiff from the paying of the order. By any standard that you apply, whether it's fair preponderance of the evidence, or clear and convincing evidence, the Court finds the plaintiff in contempt of Court for failure to pay the Court order. And the ameliorative relief in regard to this will be ordered as part of these Court orders.
The Court also, in August, — Strike that. Judge Owens, in August, yes, August 1999, issued a schedule of visitation for the parties; children with Mr. Lakin and access for vacation for Ms. Lakin with the children. The orders specifically said that the children shall be on vacation for one week with the plaintiff commencing August 16, 1999, the plaintiff is Ms. Lakin. There is nothing ambiguous about this order. There's nothing unclear about this order. Ms. Lakin kept the children with her in California past August 16, 1999 and therefore, specifically violated that Court order.
The Court finds that these parents provide different things to the children. And when the Court makes these findings and makes the orders in regard to custody they are based upon case law, based on the present needs of the children and based upon the present abilities to parent of these respective parties. And while the history is instructive, the Court must make orders based upon what these children need.
These children — the Court notes, first of all, have been severely and adversely affected by these proceedings. The children have been deprived of significant access of visitation with Mr. Lakin at periods of time during these proceedings, to CT Page 16619 their detriment. The proceedings need, for the benefit of these minor children, to come to a conclusion as soon as possible — in these orders, with finality to them. And these orders reflect the children's need for absolute finality, so that they can go about their lives.
The Court finds that Ms. Lakin provides a kind of instinctive nurturing to the children, which is important for them in terms of the warmth and growth that they need. Her ability to go about the mechanics of day to day parenting has been severely and significantly diminished by her own mental health conditions. It has not, however, either diminished her ability to love her children or transmit that love to the children. Therefore, the children need a significant contact with her for the strength of their growth as people.
Mr. Lakin provides other significant skills and importance to the children. He provides, among other things, the ability to function on a day to day basis and meet the day to day needs of the children. He provides an ability for the children to get where they need to be, when they need to be there and make sure that they meet their appointments. The Court has not gone into all of the problems but it notes, for instance, that the children have missed physicals, have missed orthodonture appointments, and appointments with their own mental health professioners while in the care of Ms. Lakin; not intentionally, but unintentionally.
The Court agrees, whole-heartedly, with the evaluation of Dr. Adamakos and the notation by Mr. Reitano, that the problem Mr. Lakin has, is that he's still learning how to parent. And that that which may be instinctive to Ms. Lakin, is a learned skill, by him. He shows a willingness to do so and an ability to learn from his mistakes. The issues in regard to Lexy and wiping her bottom, as it were, or allowing her to sleep with him; in a non-divorcing family would be dealt with routinely within the context of the home and would not have been grand issues. The developmental needs of children at specific ages, if not known instinctively, can be learned. Mr. Lakin has learned the needs for independence of Lexy, has been responsive to Ms. Olifson when they have been pointed out, and has reformed his conduct accordingly.
The Court is not concerned, just as it was not concerned about the drug issue, about the gun issue. It's a historical CT Page 16620 issue; it shows poor judgement, but not sustained poor judgement and has not continued in this manner. The children, while concerned to be at risk, were never in an instance provided to the Court, thankfully, at actual risk and are presented to be in no risk at the present time.
The Court is also concerned that that which makes it difficult for Ms. Lakin to function on a day to day basis as a parent in a way that provides for the needs of the children, it also presents her from being able to, in any meaningful way, support herself on a day to day basis, and these orders reflect that concern as well.
Prior to entering the orders, the Court, as a threshold matter, wants to deal with the ante-nuptial agreement. In order to do so, the Court must decide whether Connecticut, the forum State, has a material greater interest in the disposition of this matter. And further, whether enforcement of the premarital contract under California law would be contrary to a fundamental policy of this state. For that point, see section 187 of the Restatement 2nd of Conn. of Conflict of Laws, 1971, Elgarder vs. Elgarder, 238 Conn. 839, 849; Ricoal Chemicals, Inc. vs. Hartford Accident Indemnity Company, 243 Conn. 401-413, 1997.
The Court concludes that under the circumstances of this case, Connecticut has a materially greater interest in California in applying its own law. While the parties negotiated and executed the agreement in California and during the first four years of their 18 year marriage lived in that state, they moved to Connecticut nearly 15 years ago. Mr. Lakin resided in Connecticut until after his separation from Ms. Lakin when he moved to New York. Ms. Lakin continues to reside in Connecticut. Much of the parties acquired, what during the marriage, including the marital home, the only jointly held asset, is located here in Connecticut. Lastly, the couple did elect to pursue their divorce action in Connecticut. In addition, the Court further concludes that application of California law under these circumstances would work an injustice.
Prior to the enactment of the Respective Premarital Agreement Acts, Connecticut and California employed markedly different approaches to accessing the validity of ante-nuptial agreements. The Lakin premarital contract predates the Uniform Premarital Agreement Act, adopted in part by California and Connecticut. And therefore, must be reviewed using the relevant CT Page 16621 law of the respective jurisdictions at the time of its making, which was 1981. Unlike California, Connecticut does not treat an ante-nuptial agreement in the same manner as an arm's length commercial contract. Instead, giving the nature of the marital relationship, Connecticut implies a confidential or fiduciary relationship between the parties.
More ever, California law imposes only minimum safeguards. That is, that the parties seeking enforcement may not have obtained the agreement by fraud, coercion, or duress. In contrast, under Connecticut law, an ante-nuptial agreement will only be enforced when three conditions are satisfied. One, "the contract was validly entered into. Two, its terms do not violate statute or public policy. And three, the circumstances of the parties at the time that the marriage is dissolved, are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice." That's citing to McHugh vs. McHugh, 181 Conn. 482, 485, 486, 1980
case.
Under the facts of this case, this Court concludes that Connecticut's interest in this controversy outweigh California's. That prior to the adoption of the Respective Uniform Premarital Acts, the two jurisdictions differed fundamentally in the treatment of these agreements. And further, that the inadequacy of California's prior law to accommodate for the unforeseen and dramatic changes in the parties circumstances, which may render enforcement, unconscionable, warrant the application of Connecticut law. Accordingly, the Court will apply Connecticut law.
Where the economic status of the parties has changed dramatically between the day to day agreement and the dissolution, literal enforcement of the agreement may work an injustice, McHugh and McHugh, supra @ 489. Because of the debilitating nature of Ms. Lakin's physical and mental health problems, which have persisted since 1990, Ms. Lakin has been unable to seek employment and, absent some significant change, is all but unemployable. Her only significant financial asset, the family home, is subject to foreclosure. An action precipitated in least in part, by Mr. Lakin's malfeasance and financial mismanagement, in that Judge Owens ordered that both parties were responsible for the payment of that mortgage, for the mortgage.
Adhering to the literal terms of the agreement would, in CT Page 16622 fact, deprive Ms. Lakin, who suffers from chronic depression, of any financial security; reward Mr. Lakin's irresponsible financial decisions; and render an unreasonably harsh and unfair result. Certainly, that is not the intent that the parties had at the time of the contract's execution. Moreover, the Court finds that Mr. Lakin's contribution to the mismanagement of this joint asset. That is, his failure to timely pay, or contribute to, or insure the payment of at least, even in part, the mortgage on the family home, subjecting the home to the Bright Harbor lien holders. Also, significantly diminished the value of the couple's only jointly held asset.
His conduct compromised Ms. Lakin's ability to establish her financial independence in the event of divorce. And, consequently, his actions constitute a material breach of their ante-nuptial agreement. A breach of contract which, sufficient even under California law, would have probably rendered it non-enforceable. Accordingly, the Court concludes that the terms of the couple's 1981 ante-nuptial agreement are not binding and, therefore, makes the following orders, which include property distribution under the statutes in case law of the State of Connecticut.
The Court makes the following orders. Mr. Lakin shall be the sole owner of his 50% shareholder interest in Lakin Tire West, or Lakin Tire of California; his 50% interest in 1325 Arctic Circle Associates; his option on the Staffordville home; his 1987 Porsche; the note receivable for Lakin East in real estate; his watches; his horse Flashdance; his gun collection; his California 401K; his life insurances, to the extent that ownership is an issue; the State of Connecticut tax refund; the funds that he is holding for the payment of the mortgage, the $37,500 approximately; and the contents of the home within which he is currently residing. And the following contents of the home in which Ms. Lakin is residing, his sailing memorabilia and trophies; his chair and desk from the area that used to be the study; and any literal personal affects, which means personal papers, personal only to him. And these items are all to be picked up within 60 days by arrangement with Ms. Lakin and it is to be accomplished outside the presence of the children, so that they are not around.
The plaintiff is to be the sole owner of the property at 110 South Salem Road, Ridgefield Connecticut, and the defendant is to deed to her by quitclaim deed within 30 days, all of his CT Page 16623 right, title, and interest and into the marital home. And the plaintiff is to indemnify and hold him harmless on the same. The plaintiff is the sole owner of the contents of the marital home, with the exception of those items that have been transferred to Mr. Lakin by these orders. She is also the sole owner of the defendant's 401K in Connecticut and to the extent that a QUADRO is necessary for the effectuation of this order, the Court will retain jurisdiction over the qualified domestic relations order, for purposes of its effectuation only, and plaintiff is to prepare the order.
The defendant, Mr. Lakin is solely responsible for the following debts for which he is to indemnify and hold Ms. Lakin harmless. The Bright Harbor LLC lien; his credit card debts, the Sears joint debt, the 1996 tax liability, entirety, and the 1998 tax liability of his entirety. The $30,000 attachment by Nusbaum, and what the Court specifically means is that Mr. Lakin is to indemnify and hold Ms. Lakin harmless on her attorney's fees due to Mr. Nusbaum, in an amount not to exceed $30,000, and such that it will cause the attachment to be removed from the marital home at a time no later than the date of sale of the home or the date of her refinancing of the home, if she chooses to do so. And she is to provide him 30 days notice of those events.
The plaintiff is solely responsible for her debt to Rosenbaum and Filyan, and for those debts listed on her financial affidavit. She also is ordered to pay $300 to Attorney Dornfeld on the motion of contempt and the sums due out of Judge Owen's order, on the motion for contempt for November of $4,335.84, if not already paid, and the sums due on October 25th, the $4,335.84 shall be paid by her within 21 days. If she fails to pay them they will be paid by Mr. Lakin out of sums to be specified here and after and credited against sums due from him to Ms. Lakin as described here and after. And that is as follows.
The defendant is to pay to the plaintiff $550,000, as lump sum alimony, payable as follows; $200,000 within 90 days. And it is from this sum of money that if Attorney Dornfeld has not been paid by Ms. Lakin, he is to pay her sums outstanding and take a credit against it of the sums due to Ms. Lakin. He's thereafter to pay her the balance of the lump sum alimony at the rate of $50,000 per year, payable on July 1st of each year, starting on July 1, 2001. He's to pay $2,000 per week as alimony, periodic alimony, to Ms. Lakin, to terminate sooner upon her death, his death, her remarriage, and her cohabitation as CT Page 16624 explained more fully hereafter.
The Court is aware of the case law regarding cohabitation. And the Court makes the following additional findings in regard to this alimony order. The Court finds, and has found, that it is not likely that Ms. Lakin can support herself in any significant way for the foreseeable future. And there is no evidence before the Court of sufficient rehabilitation on the horizon to be able to characterize this alimony as rehabilitative alimony and put a time limit on it. And therefore, the Court does not put a time limit on it. On the other hand, the Court is ascribing to Mr. Lakin this responsibility, so long as this responsibility has not been taken upon by someone else. For instance, if Ms. Lakin were to remarry, this alimony will terminate; her support will be the responsibility of not only herself but a subsequent spouse. The Court intends by cohabitation the same to apply to an individual living with Ms. Lakin as his place of abode. Now, the Court is aware that there is a further test that case law infers on a cohabitant. It is the intent of this Court to not have Mr. Lakin supporting a third party male individual cohabiting with Ms. Lakin, living with her as if she were married, without the benefit of the legal term of marriage. That is not an individual that Mr. Lakin has a duty to support. Instead that is an individual who has a duty to contribute with Ms. Lakin to her support.
The Court has already ordered and confirms the order that the defendant shall pay the Bright Harbor lien and indemnify and hold the plaintiff harmless on the same. The parties are each one-half responsible for the attorney's fees for the minor child as a result of this trial and post judgement proceedings that may result from these trial orders. And each is to pay her bill within 30 days of presentation of the bill. If there is a question as to the reasonableness it may be presented to the Court for that purpose only.
The Court has ordered that Ms. Lakin is to indemnify and hold the defendant harmless on the mortgage and other indebtedness on the Ridgefield home except for the Nusbaum attachment. This applies so long as Mr. Lakin is current in his alimony and current in his lump sum alimony payments.
The Court orders that whatever life insurance the parties currently have in affect is apparently affordable by them CT Page 16625 because they've kept it in affect and there's no questions in insurability because the life insurance is in affect. And so long as there are no questions of insurability undermining the life insurance, then that life insurance shall be maintained by the parties for the benefit of the minor children, so long as they are minors. If there is private school tuition to be paid as a result of these orders then that private school tuition shall be paid by Mr. Lakin.
The Court orders the following. That Mr. Lakin shall have sole legal custody of the minor children. Lexy shall primarily reside with him. He shall enroll her in a private day school with an extended day program to facilitate her participation and extracurricular activities. The Court is aware that Noah wishes to attend Ridgefield High school, however his performance remains poor in many key areas and he now begins to exhibit behavior problems. Noah's under performance is detrimental to his present and future well being. His special education needs require more attention than he himself is presently permitting Ridgefield High School to fulfill. Until such time, and unless Noah is enrolled by his father in private school, he shall continue to reside with his mother and attend Ridgefield High School.
As soon as Noah no longer attends Ridgefield High School, he shall reside primarily with his father, even if he is attending boarding school. The Court does not order boarding school for Noah, but requires the intention of the defendant to seek it. It's not clear whether he has admissibility criteria at the present time.
If the defendant husband chooses to engage a live in housekeeper, nanny, for the minor children, then it is recommended by the Court that he retain an individual who is at least at or over the age of 35. The Court can't order this, and declines to order it, and picks this age as an individual who has at least acquired some life experience and would show the necessary maturity of such an individual.
While Noah is in school, the school is in session and not on vacation, the access schedule provided herein will provide such that he will reside primarily with his father, subject to the mother's access schedule. The Court is aware that he may attend the boarding school and that his schedule of time with his parents, as prescribed in this access schedule, is going to be CT Page 16626 limited to that as allowed by the school, it's own schedule of requirements, and to the extent that there is conflict the school's schedule of requirements for Noah rules.
The Court also notes that the access schedule contemplates that if Noah does attend private school, that it will be a reasonable commute for both parents. And that the private school Lexy attends will, while as a day student, be in the general geographic area of where the defendant lives.
By stipulation of the parties, the Court orders that Noah will continue to treat with Ronny Cohen-Sandler and Lexy will continue to treat with Jane Olifson, for so long as the therapist determine that the treatment is beneficial to the children. The defendant husband will transport the children to and from these appointments as well as all other appointments.
The plaintiff wife shall have a reasonable, liberal, and flexible visitation with the minor children, including at least the following schedule which shall repeat on a four-week rotation. And the Court notes that until the children flip to Mr. Lakin, that this schedule contemplates that it should stay as it is because the Court has already provided an access schedule for Mr. Lakin. And so, that while the children are still with Ms. Lakin, until they revert to the physical custody of Mr. Lakin under these orders, that there is time provided for the children with Mr. Lakin under these orders. All that will differ is where the primary residence ultimately is. All right?
Ms. Lakin shall have the children with her the first and third weekends, and it will extend from the children's end of their school day on Friday until Sunday at seven. If Monday is a legal holiday, then the visitation shall extend until seven p. m. on Monday. She is to pick up the children from school and return them to the father's home. During the summer, the weekend visitation will start at seven p. m. on Thursday and end at seven p. m. on Sunday, unless Monday is a legal holiday, and then once again, it will end at seven p. m. on Monday.
When the children are with her, Ms. Lakin is to ensure that the children complete their homework. If the children are enrolled in summer school, which shall not be in the month of July, Ms. Lakin will arrange for the children to attend camps on the day they are with her. The second weekend with Lexy alone shall be for Ms. Lakin, extending from the same schedule; the end CT Page 16627 of her school day on Friday to Sunday at seven, unless it's a legal holiday `til Monday at seven. And the pickup is the same, it shall be from the school and the drop off to Mr. Lakin's. If it's the summer it starts at seven p. m. on Thursday.
Ms. Lakin shall have the children with her, to the extent that the school schedules allow, every Wednesday after school until seven p. m.; she's to return the children to Mr. Lakin's home. She will be responsible for supervising the children, making sure their homework gets done, and arranging for them to have dinner. Ms. Lakin shall have — when I said that she is not to arrange camp for the children in the month of July, I meant the month of August, excuse me. She shall have the month of July with both children. There is to be no makeup time if any of that is missed by her as a result of her own schedule.
Mr. Lakin shall have the following access schedule with the children as indicated. And, being aware that the Court has provided their primary residence with him, the Court is aware that there may be a period of time for adjustment of the children before their transition to the new schools where they may remain in Ms. Lakin's custody for a short period of time. So, he will have this access schedule during that period of time as well. He's to have the second weekend with Noah alone on a four week cycle, and he is to also have the fourth weekend with both children. And if the children are still, during this brief hiatus, with Ms. Lakin then he is to do the pick up after school and the return to her house on the reverse schedule of what she's doing. In other words, the return after on Sunday at seven, unless Monday's a legal holiday, and then Sunday at seven.
Now, until such time as the children revert to his house under these orders, he's also to have Wednesday after school until seven p. m. and be responsible similarly for feeding them during that period of time and homework. He's to have the month of August with the children completely.
Now, the Court makes the following holiday schedule, which takes priority over the regular schedule. Ms. Lakin shall have the children with her on the following odd number years; Thanksgiving from the close of school on Wednesday until Sunday at seven. And then she shall have them with her the second half of the Christmas school break until seven p. m. on the evening, presuming, prior to the resumption of school. And please remember, for these orders, if Noah needs to be back for school CT Page 16628 or something like that earlier because the school requires it, then it ends earlier. She'll have an odd number of years, she have Noah from the close of school until eight p. m. as the school allows. And even number of years, she'll have Lexy from the close of school on her birthday — that was on Noah's birthday — and on Lexy's birthday is an even number of years, from the close of school until eight p. m.
Now, the school's scheduled vacations are not at all clear. If there is only one vacation after Christmas, and not two, and that's a spring vacation; if it's only one week, the children are with Ms. Lakin that week an even number of years, and with Mr. Lakin in odd number of years. If there are two weeks, then in each year she'll have the children the first week and he'll have the children the second week. If the period of time is something less than two weeks, then it reverts to the odd/even schedule.
Also, in even number of years, she'll have the children for the first half of the children's school Christmas break from nine a.m. on the day following school, the last day of school, until seven p. m. on the evening of the mid point of the break. She will have the children with her every Mother's Day and Mr. Lakin shall have the children with him every Father's Day.
Each party is to keep the other informed of the whereabouts of the minor children. And if the children are going to be away from home more than two nights, then tell where they are going to be and where they are staying and the telephone number. This is not meant to be a micromanaging indication, it's simply if the children start going away for a period of time, in excess of, for instance, a weekend the other parent has the right to know about where they are going and how to reach them.
Each parent is to tell the other parent right away of any illness or injuries seriously effecting the children, and give notice promptly. Now, Mr. Lakin has sole custody of the children. He will make all the non-emergency medical and health care appointments for the children, not Ms. Lakin; but he will notify her of the results. In the case of an emergency, Ms. Lakin may seek the services of a health professional for the children, but at no other time. If there is an emergency, each is to notify the other party immediately. The children have the right to call their parents, at will, from the other parent's house. And each parent has the right to call the children for a period not in CT Page 16629 access of 10 minutes when they are with the other parent, either in the morning before eight, or in the evening after five. This Court imputes reasonableness to this from time to time; children simply are on a schedule that they are not around, but that should not be on a regular basis. The Court orders each of the parties to maintain an answering machine or a beeping service such that the parties, the other parent can reach them promptly in the case of emergency.
Ms. Lakin shall have the right of access of all the records of the children for their academic schoolwork and for medical and health issues. Mr. Lakin is to insure that Ms. Lakin has notice of all the children's school and sports and extracurricular activities. He is not to schedule them unduly so that they occur only on the times of Ms. Lakin' s visitation. However, for instance, if a child is on a team and a game is on at the time of Ms. Lakin's time with the children, she's to make sure the children get there. And if Mr. Lakin shares the children's schedules then there will be a prevention of any conflict from that.
He will make sure that Ms. Lakin has availability to her all the perks of parenting that come from these activities including, as referred to by the attorney for the minor children, parent tickets for special events. The Court expects that the parties are going to accommodate their schedules to the special needs of children so that the children can go to the social events scheduled for them by their peers; whether that be parties, or the like.
The Court also emphasizes for the parties that these children need to be supported in their ongoing counseling and not undermined in that process. The Court orders that — does not order the plaintiff to pay child support because the Court has not found an earning capacity in the plaintiff. The Court orders that the defendant shall pay visitation expenses for the plaintiff for the month that the children are with her, $1500; so that she can have appropriate visitation during that period of time of that month with the children.
Court orders no alimony to Mr. Lakin. The Court orders no further attorney's fees to either of the parties' attorneys.
Mr. Miller, do you think I missed anything? CT Page 16630
ATTORNEY MILLER: No, your Honor.
THE COURT: Attorney Andersen, do you think I missed anything?
ATTORNEY ANDERSEN: Your Honor, I'm not sure that, perhaps I didn't miss something — going back to the plaintiff's visitation, you said, "It shall be reasonable, liberal and flexible, including on a four week rotation." And you said the first and third weekend would be with both children, and then you said the second weekend would be with Lexy only. Did you say anything about the fourth weekend?
THE COURT: No, I didn't and I intended it to be — yes, I did. Hang on let me pull my note out from that. I intended it to be with Noah only, but I didn't say it. I see where I didn't check that spot. Yes, I intended that to be with Noah only, on the same schedule, with the pick up after school and the seven p. m., to the extent that his schedule allows it.
ATTORNEY ANDERSEN: Were you also going to say something about when Lexy goes to live with the defendant? You indicated that Noah would go when private school was available, but you didn't —
THE COURT: Mr. Lakin is now the sole custodian, he has to make the judgement of whether an immediate move is appropriate, or whether he needs to make some arrangements, that's up to him.
ATTORNEY ANDERSEN: Thank you, that's what I needed to know. I have no other questions.
THE COURT: And the same is vis a vis Noah, it's simply I don't want him to jump to another public school before he goes to private school.
ATTORNEY ANDERSEN: I understand that, your Honor, thank you.
THE COURT: Do you think I missed anything?
ATTORNEY DORNFELD: No, your Honor, but if I may just clarify something. Did I understand the Court to say that the return time on midweek visit was seven-thirty or at seven p. m.? CT Page 16631
THE COURT: I think I said seven p. m. — yes, seven p. m.
ATTORNEY DORNFELD: And, your Honor, going back to that fourth weekend issue, is it your Honor's order that Noah spend the fourth weekend alone with his mother, or that —
THE COURT: Yes.
ATTONREY DORNFELD: All right.
THE COURT: That was the intent.
ATTORNEY DORNFELD: So there is no weekend in which both children are with their father?
THE COURT: That's right, and that was the intent as well.
ATTORNEY DORNFELD: Thank you, your Honor.
THE COURT: Okay?
ATTORNEY ANDERSEN: Is this a Yontef order?
THE COURT: Yes.
Mr. Shah's concern, and he may be right, that I may not have formally indicated that the marriage between the parties is dissolved and it is so ordered.
Good luck, folks. That's all I can say at this point, I hope you work it out. Thank you.
BY THE COURT:
Munro, J.